In the Matter of Charges against and a Petition for the Removal from Office of JOHN THEOFEL as Chief Clerk of the Surrogate's Court, County of Queens.

Surrogate's Court, Queens County, May 4, 1932.

Parties appeared in person.

HETHERINGTON, S. Charges signed or subscribed with the names John Haynes Holmes, chairman, Stephen S. Wise, vice-chairman, were filed with the surrogate on March 18, 1932, against John Theofel, clerk of the Surrogate's Court of Queens county. Accompanying said charges was a letter on the letterhead of the city affairs committee of New York, likewise signed or subscribed with the names of the two gentlemen mentioned. From the similarity of the handwriting, the indications are that these are subscriptions, no doubt fully authorized, rather than signatures. Said charges ask for the clerk's removal. They are not verified.

Personal knowledge of the truth of the allegations therein contained is nowhere claimed. The inference is that they are made on information and belief, though not even that is stated. A copy of the charges was served by the surrogate on the respondent, and he has filed his answer.

The charges filed are eight in number, of which two, the fourth and eighth, relate directly to respondent's fitness and qualifications for the office of clerk of this court. The charges, briefly summarized, relate (1) and (2) to acts or omissions of respondent in 1928 when he was treasurer of the campaign committee of his party; (3) to the amount of his deposits in bank in 1930, for a considerable portion of which, it is alleged, " he could give no reasonable or credible explanation; " (4) " That John Theofel is unfamiliar with the duties of the office of chief clerk of the Surrogate's Court, is incompetent to discharge such duties, and unqualified to hold the position of chief clerk of the Surrogate's Court." (5), (6) and (7) relate to his connection with, and/or financial interest in, a concern selling automobiles, to the fact that respondent was chairman of the executive committee of the Queens county committee of his party and that he influenced business in favor of said automobile concern from office holders and others. The sixth charge sets forth details of a transaction or combination of two transactions involving said alleged interrelation between appointment to office and the patronizing of said automobile concern, and No. (7) states very concisely a rule of public policy as to which there can be no debate, viz.: " That the use of the power of public patronage for the benefit of a corporation in which the leader of the dominant political party has a financial interest is contrary to sound public policy, and constitutes conduct unbecoming a public official." Charge No. (8), in the form of conclusions, quoted *verbatim*, is as follows: " That, by reason of the foregoing, it has been demonstrated that John Theofel has violated the statutes of this state; that he is guilty of conduct unbecoming a public official; that he is incompetent to perform the duties of chief clerk."

It will thus be seen that the surrogate is asked to consider not only the question of respondent's fitness and competency for his office, without mention of a single specific act or omission, but he is asked also to remove respondent for acts and omissions before his appointment.

There is no charge of misconduct in his present office.

The respondent, in his answer, contends that the surrogate has " no legal right or power to consider any of the charges except perhaps the fourth," dealing with incompetency, but said answer also discusses the merits, denies the truth of each of said charges

and adduces proof in support of his denials. If respondent's first contention be sustained, it would remove from the surrogate's consideration the allegations as to respondent's alleged acts in other capacities than that of clerk of the court.

While it is to be noted that in a recent case Governor Roosevelt exercised the absolute and unqualified power of removal given him by article X, section 1, of the State Constitution, this provision does not restrict the Governor's power of removal to " cause shown," but leaves it entirely to the discretion of the chief executive of the State to remove certain so-called constitutional officers on any grounds that appeal to the conscience or good judgment of the Governor. The Governor's action was an executive, not a judicial, act and, therefore, not reviewable by the courts (*Matter of Guden*, 171 N. Y. 529); whereas the surrogate's power of removal of the chief clerk is found within the four corners of section 22 of the Surrogate's Court Act, which provides in part: " Each such chief clerk shall hold office for five years unless sooner removed by the surrogate for cause, after trial, upon charges duly served upon him and an opportunity to be heard."

The basis for the restriction of the surrogate's power of removal is set forth by Chief Judge CULLEN, in *People* v. *Ahearn* (196 N. Y. 221, at p. 253) as follows: " But for the courts to declare a disqualification not enacted by the legislature or by the Constitution is, to use the language of Lord CHATHAM, not to declare the law, but to make the law."

The legal meaning of the phrase " for cause " has been repeatedly and widely interpreted.

The present chief justice of the United States, when Governor of this State, wrote: " It may be granted that the act or neglect justifying removal must have relation to the administration of office during the term which the officer is serving. And the case of Sheriff Guden [171 N. Y. 529] is not an exception to this rule." (Public Papers of Governor Hughes, 1907, p. 279.)

Judge GAYNOR, in the *Guden Case* (37 Misc. 390), held that " the acts for which the Governor may remove an officer must have been committed by him in office and must be neglect or misconduct in office," and he supports it in his trite manner by calling attention to the fact that despotic power has been finally done away with in this country; that government here is by the people through laws and limitations on official power, and no citizen, however humble, is subject in any of his rights to the arbitrary power of any official, from chief executive down. The official is responsible as an official, *i. e.*, for his conduct in office.

It is true that Judge GAYNOR was reversed in the Appellate

Division (71 App. Div. 422), but the principle of his decision was sustained. Judge WILLARD BARTLETT of that court, discussing article X, section 7, of the State Constitution as to removals of certain elected officials, to wit, " all officers, except judicial, whose powers and duties are not local or legislative," being careful to note, as stating the policy of the State as to removals other than those by the Governor in his discretion, the following, " It is a significant fact that in this section the power of removal is expressly restricted to ' misconduct or malversation in office,' while no such limitation is contained in the section relating to removals by the Executive."

The great trend of authority throughout the United States and England is opposed to any inquiry into acts committed before his entry into office. (43 C. J. 657; 40 Am. & Eng. Ann. Cas. 709, and cases cited; 2 R. C. L. [1918 ed.] § 284.)

In *Matter of Conant* v. *Grogan* (6 N. Y. St. Repr. 322) Presiding Justice LEARNED wrote (at p. 323): " The court should never remove a public officer for acts done prior to his present term of office."

In 1878 a city marshal of the city of Newburgh was removed for admitted failure in his duty in another office, namely, collector of taxes, where the official had failed to turn into the city treasury certain taxes collected by him. The General Term of the Supreme Court, in *People ex rel. Bancroft* v. *Weigant* (14 Hun, 546, 547), held that his removal was not justified and he was reinstated. The court said that the " ' incapacity, misbehavior or neglect of duty' must be established against the relator in respect to the office of marshal." (See, also, *Carlisle* v. *Burke*, 82 Misc. 282, and cases cited.)

The courts of this State have been astute to provide against unwarranted removal. The rule is well settled that a removal to be justified must be for something causing prejudice to the public rights or seriously interfering with the discipline of the office or department. (*People ex rel. Rigby* v. *Anderson*, 198 App. Div. 283; *People ex rel. Winspear* v. *Kreinheder*, 197 id. 887; *People ex rel. Devaney* v. *Greene*, 89 id. 296; *People ex rel. McCabe* v. *Fire Comrs.*, 43 Hun, 554.)

In *Matter of Barlow* (141 App. Div. 640) the act involved a serious miscarriage of justice in an admission to bail of defendants not entitled to that consideration. Although the magistrate exceeded his authority in said respect, the Appellate Division denied the application to remove the magistrate from office, notwithstanding the fact that no trace of the prisoners was ever discovered.

In *People ex rel. Clarke* v. *Roosevelt* (168 N. Y. 488) the Court of Appeals held the police commissioners strictly to the *record*

and to the evidence adduced on the trial and sternly ruled out knowledge of the commissioners *dehors* the record. It will be seen, therefore, that respondent's contention is right and the surrogate is without authority to consider this phase of the charges.

With regard to respondent's discharge of his duties as clerk of the court, the surrogate may speak of what he has himself observed and what every one having business with the court knows or could easily ascertain.

On the surrogate's induction into office in July, 1930, it was realized that the ways and methods of an earlier day were inept and unwise. The surrogate saw that the valuable records of the surrogate's office were not properly cared for. These records, in many cases muniments of title to real and personal property of untold value, of legitimacy, etc., were formerly housed in the so-called "record room" and were accessible to all with agility enough to use the "traveller step-ladder." These records of probate, administration, guardianship, etc., after the fashion of a former time, were taken from the rack by each man for himself, without requisition or receipt. In rectifying the situation referred to and in the arrangements necessary to make reasonably safe the priceless records of this court, the respondent proved especially helpful to the surrogate (due, no doubt, to his previous experience as deputy county clerk, where he had had a similar problem).

He was also concerned, on assuming office as chief clerk, with the modernizing of the filing and recording system. He inquired concerning and examined the systems prevailing in other counties, noted the requirements of our own and, in the light of what he learned, there was installed a flat-filing system, an intelligible and convenient indexing and recording method, the departments were rearranged and the assistants were reassigned. The respondent superintended this work and a high standard was maintained by personal supervision; all to the acknowledged convenience and satisfaction of the lawyers and the public whose business calls them hither. Letters from prominent members of the bar, notably former Surrogate Daniel Noble, Col. Edward S. Malone, a member of the committee on character and fitness of candidates for admission to the bar, Mr. Eugene V. Daly, former member of that committee, former Judge William Rasquin, Jr., Mr. George J. Schneller, now president of the Queens County Bar Association, Mr. Clinton T. Roe, Mr. Charles W. Froessel and Mr. Emile E. Rathgeber, former presidents thereof, Mr. A. T. Payne, former chairman of its grievance committee, Mr. Arthur T. O'Leary, former law assistant to the surrogates of New York county and now chairman of the surrogate's court committee of the New York County Lawyers'

Association, and other gentlemen, all of high standing, who have constant dealings with this court and office and contact with its clerk, testify to the marked efficiency, intelligence and courtesy of the entire staff. These letters were prompted by publication of the charges in the press, and are filed herewith. They show that no breakdown has occurred in the administration of the office. Not a single complaint has ever been received by the surrogate of any act of malfeasance, misfeasance, neglect, inefficiency or discourtesy on the part of any member of the surrogate's staff. The charges are made, as far as known, by gentlemen who have never had any contact with this court. The names of the officers and executive committee of the city affairs committee, as printed on the letterhead already referred to, are not, as far as known, those of any of the hundreds of people who from one end of the year to the other, come to this court. Mention is made of this point without any desire to be captious. That lack of personal knowledge of the facts alleged *goes to the merits* is borne out by the words of Presiding Justice LEARNED, in the *Grogan Case (supra)*, in whose opinion is found a rule that is just as necessary and just as important to-day as it was in 1887. At page 324 he wrote: " The charges presented to us are verified by an affidavit of Carlos B. Conant, that they are true to the best of his knowledge, information and belief. Such an affidavit does not show that the affiant has any knowledge on the subject whatever."

But, as has been said, in the instant case no one verifies the charges or makes oath, in the remotest way, to their truth either on knowledge or information. Quoting further from Judge LEARNED's opinion (p. 325): "A hearing before this court would be less objectionable. But the respondent should not be subjected to that until we have been convinced that there is good reason therefor. We will not place the respondent upon trial until we are satisfied that the good of the people demands this."

But in the instant case the surrogate is asked to remove this respondent for acts and omissions, the truth of which has never been proven or established in any court or elsewhere. Is it not fair to say, on the record in this case, that such removal is asked for merely on allegations which no one has shown a willingness to vouch for, either of his own knowledge or on information and belief?

Though the whole duty of this court is done when it functions only within the jurisdiction conferred, and having done so, renders judgment accordingly, it may not be amiss to quote the following extract from a recent article by Prof. Raymond Moley, professor of public law at Columbia University and research director of the

New York State Commission on the Administration of Justice: " Widely accepted standards of political ethics must come as the resultant of many individual voices, speaking, it may be, through groups, which ultimately find practical and workable formulation by political leaders. ' The quality of these leaders largely depends upon the quality of the public discussion that attends their selection. We cannot by the enactment of laws or the making of new governmental machinery relieve ourselves of the obligations implied in self-government. Nor can we find a mechanical substitute for the political leader."

My personal observation of Mr. Theofel's conduct in the office of chief clerk, coupled with the commendation of the bar and his answer to the charges, leads me to the conclusion that on the facts and following the law as laid down in the decisions hereinabove referred to, the charges must be and are dismissed on the merits.